Paolo Morante, Esq.
Forrest W. Treat, Esq.
**DLA PIPER LLP (US)**
1251 Avenue of the Americas
27th Floor
New York, NY 10020-1104
(212) 335-4500

Anthony Colasanti, Esq.
4 York Avenue
2nd Floor
West Caldwell, NJ 07006
(973) 228-8555
*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| METROPOLITAN ARCHITECTURAL WOODWORK LLC<br>601 Lehigh Ave<br>Union, NJ 07083,<br><br>               Plaintiff,<br><br>   v.<br><br>NEW YORK BUILDING CONTRACTORS ASSOCIATION<br>451 Park Avenue South<br>New York, NY 10016,<br><br>UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA<br>101 Constitution Avenue NW<br>Washington, DC 20001,<br><br>NEW YORK DISTRICT COUNCIL OF CARPENTERS<br>395 Hudson St # 9<br>New York, NY 10014, AND<br><br>DOE ORGANIZATIONS I - XX<br><br>               Defendants. | Civil Action No.<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Metropolitan Architectural Woodwork, LLC ("Metropolitan"), by and through its undersigned counsel, hereby complains and alleges, with personal knowledge except as to those allegations made on information and belief, as follows.

## NATURE OF THE ACTION

1. This action arises from Defendants' conspiracy to monopolize and exclude non-New York City-based ("non-local") contractors from the business of installing wood-based architectural products in New York City, New York. Defendants have engaged in a pattern of concerted practices intended to raise the costs of non-local contractors in order to make it more difficult for them compete with New York City-based ("local") contractors.

2. Defendants' conspiracy includes a number of different practices. Among others, Defendants have acted in concert to enter into, force non-local contractors to enter into, and enforce an international agreement containing a clause known as the "50/50 Rule," which requires contractors to hire New York City-based laborers when performing work on job sites in New York City. Further, Defendants entered into an agreement to prohibit non-local contractors, when hiring local laborers pursuant to the 50/50 Rule, from requesting specific local employees from the union's job referral list. Local contractors, by contrast, are allowed to hand-pick their chosen workers from the job referral list.

3. Defendants' conspiracy and pattern of anticompetitive conduct also includes, among other conduct, Defendants' agreement to prevent non-local contractors from participating in their "Market Recovery Program," which is a subsidy and terms-and-conditions waiver program designed to reduce labor costs for local contractors in order to enable them to be more competitive when bidding on architectural woodwork installation projects in New York City. Without the ability to participate in the Market Recovery Program, non-local contractors are

subject to the full terms and conditions of the Defendants' collective bargaining agreements, causing higher costs and reduced profits.

4.  Whether Metropolitan uses its own laborers or New York City-based union laborers on a job site located in New York City, it is required to satisfy the terms of its union agreement with respect to wages, hours, and working conditions. In other words, it must treat New York City and New Jersey laborers alike when working on a New York City job site. Thus, the Defendants' actions in no way protect the members of the Defendant unions with respect to wages, hours, working conditions, or other mandatory subjects of collective bargaining. Rather, the purpose of Defendants' conspiracy is to place non-local contractors at a substantial disadvantage when competing for architectural woodworking contracts in New York City, and has the effects of (1) raising the costs to non-local contractors of doing business in New York City and lowering costs solely for local contractors; (2) making non-local contractors less efficient by preventing them from using their own employees; (3) causing non-local contractors to lose bids, contracts, and profits; and (4) reducing competition in the relevant market for the installation of wood-based architectural products in New York City; and (5) raising the costs to consumers of hiring contractors to perform installations of wood-based architectural products in New York City.

5.  Plaintiff brings this action to recover treble damages and injunctive relief for violations of Sections 1 and 2 of the Sherman Act of 1890 ("Sherman Act"), 15 U.S.C. §§ 1, 2, pursuant to Sections 4 and 16 of the Clayton Act of 1914 ("Clayton Act"), 15 U.S.C. §§ 15, 26, and any other damages this Court may deem appropriate.

## JURISDICTION AND VENUE

6. Plaintiff brings this action under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26. This Court has subject matter jurisdiction over this Complaint under 28 U.S.C. §§ 1331, 1337(a).

7. Venue is proper in this Court under 15 U.S.C. §§ 15, 22 and under 28 U.S.C. § 1391(b) and (c).

## PARTIES

8. Plaintiff Metropolitan Architectural Woodwork, LLC is a New Jersey corporation headquartered at 601 Lehigh Ave, Union, NJ 07083. Metropolitan is a woodworking subcontractor that manufactures and installs wood-based products such as doors, cabinets, wall paneling, and flooring in small and large construction projects.

9. Defendant United Brotherhood of Carpenters and Joiners of America (the "UBCJA") is a labor organization within the meaning of the National Labor Relations Act, 29 U.S.C. §§ 151 et seq., headquartered at 101 Constitution Avenue NW, Washington, DC 20001. The UBCJA is an international union primarily representing carpenters and woodworkers. The UBCJA's membership includes "local" unions throughout the country which are often grouped into "District Councils" by regional or metropolitan area.

10. Defendant New York District Council of Carpenters ("NYDCC") is a labor organization within the meaning of the National Labor Relations Act, 29 U.S.C. §§ 151 et seq., headquartered at 395 Hudson St # 9, New York, NY 10014. The NYDCC is a member organization of the UBCJA and is composed of eleven New York City-based local unions representing New York City-based carpenters, millwrights and machine erectors, dockbuilders, timbermen, cabinetmakers, and resilient floor coverers.

11. Defendant New York Building Contractors Association ("BCA") is an incorporated multi-employer bargaining unit composed of New York City-based contractors and headquartered at 451 Park Avenue South, New York, NY 10016. The BCA represents over 300 construction organizations in negotiating collective bargaining agreements with construction labor unions – including the NYDCC – which, among other things, set the wages, benefits, hours, and working conditions for work done in New York City by employees of the signatories thereto.

12. Defendants Doe Organizations I – XX are fictitiously named organizations whose identities are presently unknown to the plaintiff. The plaintiff, upon learning the true names and identities of these fictitiously named organizations, shall move this Court to amend this Complaint and pleadings in this action to reflect the same.

## FACTUAL ALLEGATIONS

### Background

13. The architectural woodworking business consists primarily of the manufacture of wood-based architectural products and the installation of those products at construction sites and in buildings. Some architectural woodworking manufacturers only create these products, relying upon subcontractors to install these product at their customers' job sites. Others both manufacture and install these products.

14. The relevant market is the installation of wood-based architectural products in small and large construction projects in New York City, New York. The service of installing wood-based architectural products, such as doors, cabinets, wall paneling, and flooring, is not interchangeable with other architectural installation services due to a variety of reasons including customer demand, pricing, specialized vendors, industry perception, and others. The installation

services delivered to customers in New York City are similarly distinct from installation services delivered to customers in other areas due to pricing, specialized vendors, regulatory requirements, industry perception, and others.

15. The relevant geographic market for the delivery of installation services to customers in New York City is the greater New York metropolitan area, including New York City and portions of New York state, New Jersey, and Connecticut. Customers in New York City regularly turn to suppliers in the greater New York metropolitan area for the installation services in question. Suppliers located outside of New York City and within the greater New York metropolitan area have supplied installation services to customers in New York City and, but for Defendants' anticompetitive practices, would be in a position to compete more efficiently in supplying installation services to customers in New York City.

16. Metropolitan manufactures wood-based architectural products at its Union City, New Jersey headquarters. Metropolitan employs approximately 70 employees who primarily perform manufacturing work in the shop and also install the products they manufacture at customers' job sites. From time to time, Metropolitan installs these products at job sites in New Jersey and surrounding areas, including in New York City. Approximately fifteen to twenty Metropolitan employees are capable of performing installations. Many of these employees have worked with Metropolitan for over ten years. Metropolitan's employees, who principally reside in New Jersey, bring value and efficiency to Metropolitan's installations in the form of consistency, speed, and familiarity.

17. Metropolitan began its current business operations in 2002 when it purchased NJS Carpentry, Inc., continuing to do business as NJS Carpentry, Inc. and eventually doing business as Metropolitan Architectural Woodwork, LLC. After the sale, Metropolitan wished to accept

contracts for installation projects in New York City because of the opportunities that these contracts presented for Metropolitan to expand its business and increase its profits.

18. Prior to the sale, the shop employees of Metropolitan were represented by Carpenters' Local 821 of the UBCJA ("Local 821") and worked under a collective bargaining agreement negotiated by the previous owners of Metropolitan. Local 821 is composed entirely of employees of Metropolitan. Upon the sale in 2002, the new owners assumed the current agreement and kept all of the employees working in the shop. This agreement was last negotiated in July, 2006.

19. At the time of the sale, Metropolitan was led to believe by the UBCJA that in order for its employees to perform work in New York City, it would be required to enter into an agreement with the UBCJA that covers all installation work performed by Metropolitan in New York City (the "International Agreement"). Furthermore, the UBCJA led Metropolitan to believe that if it sent its workers to New York City without signing and abiding by the International Agreement, the UBCJA and local union members would create disruptions at the job sites to which those employees were sent. These disruptions could include picketing, protests, threats, demands that union workers stop working on the job site, and others. Such methods have effectively disrupted work on construction job sites in the past.

20. Upon completion of the sale of Metropolitan to its new owners, Metropolitan entered into the International Agreement. A true and correct copy of the International Agreement is attached hereto as Exhibit A. Metropolitan was not given an opportunity to negotiate the terms of the International Agreement. Rather, the UBCJA told Metropolitan that it must sign the International Agreement as written in order to perform installation work in the relevant market.

## The 50/50 Rule

21.     Pursuant to Article V of the International Agreement, an employer that performs work in a jurisdiction other than its home area is obligated to hire at least fifty (50) percent of its workers for that job from the job referral list of the Local Union or District Council (the "50/50 Rule"). This obligation is subject to a threshold of only two "key" traveling employees, meaning that the employer is permitted to bring up to two of its own "key" traveling employees without having to hire any local employees. In order to bring more than two of its own employees, however, the employer must hire at least fifty (50) percent of the additional workers for that job from the job referral list of the Local Union or District Council, matching its own employees with local employees on a one-for-one basis. The International Agreement is implemented and enforced by the Defendants.

22.     Under the 50/50 Rule, most New York City-based union employers must also hire fifty (50) percent of their employees from the union's job referral list for work performed in the relevant market. However, the Collective Bargaining Agreement between the BCA and the NYDCC (the "BCA Agreement") includes a Side Letter which states that New York City-based employers can "request" which employees they want and that "all requests will be honored" provided that the requested employees are members of the NYDCC. A true and correct copy of the BCA Agreement is attached hereto as Exhibit B. The BCA Agreement is implemented and enforced by the Defendants.

23.     By operation of the Side Letter's express terms, "requests [for specific employees from the job referral list] cannot be used to match out of town carpenters." As a result, the BCA Agreement prohibits the NYDCC from allowing non-local contractors to request specific individuals from the job referral list when matching non-local carpenters. Thus, when matching

non-local carpenters for work to be performed in New York City, non-local contractors must hire unknown, unfamiliar, and potentially less-qualified employees. By contrast, New York City-based employers can request employees who are already familiar with that particular employer's operations and methods and who the employer already knows can do high-quality work efficiently.

24. The 50/50 Rule places contractors from outside New York City at a competitive disadvantage when working on projects in New York City. This competitive disadvantage is created because New York City-based contractors can perform work in New York City using their chosen and preferred laborers, while non-local contractors must hire laborers assigned to them by the NYDCC who are likely to be less skilled and efficient than laborers those non-local contractors would select if they had a choice. For example, laborers assigned to Metropolitan by the NYDCC in the past have been trained in irrelevant skills and thus unqualified for architectural woodworking installation. The resulting inefficiency raises the operating costs of non-local contractors when performing installations in New York City and potentially lowers the quality of installation services received by New York City customers.

25. Whether Metropolitan uses its own union employees or New York City-based union laborers on a job site located in New York City, it is required to use union laborers and to provide the same wages, benefits, hours, and working conditions. Thus, the combination of the 50/50 Rule and Side Letter does not promote the interests of union workers with respect to wages, hours, working conditions, or other mandatory subjects of collective bargaining. Indeed, the combination of the 50/50 Rule and Side Letter does not relate to these subjects in any way. Rather, the only purposes and effects of prohibiting non-local contractors from requesting employees from the NYDCC's job referral list under the 50/50 Rule and Side Letter are to

disadvantage non-local contractors, raise those contractors' costs of competing in the relevant market, and thereby reduce or foreclose competition in the relevant market.

### The Market Recovery Program

26. Pursuant to a Memorandum of Understanding between the NYDCC and the BCA dated June 30, 2006, the NYDCC and the BCA have established a "Market Recovery Program." A true and correct copy of the Memorandum of Understanding is attached hereto as Exhibit C.

27. The Market Recovery Program provides a means for the BCA and its members to request that the NYDCC waive application of certain terms and conditions of the BCA Agreement, such as premium pay for work activities, shift work, and work hours. If the NYDCC agrees to do so, the requesting BCA members may enjoy a significant reduction in labor costs, which allows them to price their services in the relevant market at a lower rate than those of their non-local union competitors, thereby making BCA members more competitive and thus more likely to win bids for contracts in the relevant market.

28. Despite the provision in Article I of the International Agreement that non-local contractors are to be subject to the same collective bargaining arrangements as the employers or recognized employer agencies in New York City, the Market Recovery Program and other provisions of the BCA Agreement are not available to non-BCA members such as Metropolitan. Instead, the Defendants informed Metropolitan that, when performing work in New York City, the applicable local collective bargaining arrangement is a generic "Independent Contractor Agreement" which contains no provision for a Market Recovery Program. BCA members are not subject to the Independent Contractor Agreement. A true and correct copy of the Independent Contractor Agreement is attached hereto as Exhibit D.

29. Despite the fact that non-local contractors employ union workers (both local and non-local), Defendants refuse to allow non-local contractors access to the BCA Agreement's Market Recovery Program. Thus, the Market Recovery Program does not promote the interests of union workers with respect to wages, hours, working conditions, or other mandatory subjects of collective bargaining. Rather, the Market Recovery Program exists solely as a mechanism to disadvantage non-local contractors when they compete with local BCA members. The only purposes and effects of the Market Recovery Program, therefore, are to disadvantage contractors located outside New York City, raise those contractors' costs of competing in the relevant market, and thereby reduce or foreclose competition in the relevant market.

## Impact of Defendants' Conduct

30. Metropolitan has historically been awarded contracts to both manufacture wood-based architectural products and install these products at job sites in New York City. Metropolitan has manufactured these products, but because of the higher costs caused by Defendants' conduct, Metropolitan has been forced to subcontract its installation work to New York City-based installation companies. Despite obtaining contracts to both manufacture and install architectural wood-based products in New York City, Metropolitan has not performed an installation of its products at a job site in New York City since at least 2007.

31. Because of the effects of Defendants' conduct, most non-local contractors are unable to compete in the relevant market.

32. Absent the Defendants' anticompetitive conspiracy and conduct, Metropolitan's costs to perform its own installations of wood-based architectural products at job sites in New York City would be as low or lower than those of its New York City-based competitors. Additionally, absent the Defendants' anticompetitive conspiracy and conduct, Metropolitan

would be more competitive in the relevant market and would be able to win a greater number of jobs and realize higher profits from performing its own installations at job sites in New York City.

33. The Defendants' conspiracy and resulting pattern of conduct to monopolize and exclude non-local contractors from competing in the relevant market has raised the costs to non-local contractors of competing in the relevant market, making it more difficult for them to obtain contracts in the relevant market, reducing output in the relevant market, artificially raising prices for consumers and depriving them of the benefits of competition in the relevant market.

34. Because of the effects of the Defendants' conspiracy and resulting pattern of conduct, including Defendants' conspiracy to prohibit Metropolitan from requesting employees from the NYDCC's job referral list and from participating in the Market Recovery Program, Metropolitan has been unable to effectively compete for business in the relevant market, has incurred higher costs, and has lost profits. The same conspiracy and conduct has had the purpose and effect of reducing competition and raising prices paid by customers in the relevant market.

**COUNT I: CONSPIRACY IN RESTRAINT OF TRADE**

35. Plaintiff incorporates Paragraphs 1-34 as set forth above herein by reference.

36. Through the International Agreement and the BCA Agreement, the Defendants have combined and conspired to unreasonably restrain competition in the relevant market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

37. The Defendants' conspiracy and anticompetitive acts in furtherance thereof had the effects they were intended to have, including among others:

    a. Depriving purchasers in the relevant market of competition from non-local contractors for the installation of wood-based architectural products;

b. Depriving Metropolitan and other non-local contractors of the opportunity to compete on the merits for contracts in the relevant market;

c. Raising the costs to non-New York City-based rivals of competing in the relevant market by forcing non-local contractors to enter into a non-negotiable International Agreement that raises the costs of doing business in the relevant market only for non-local contractors; and

d. Decreasing output and artificially raising and maintaining the prices of installing wood-based architectural products in the relevant market.

38. The intended result of the Defendants' conspiracy has been and will be to place non-local competitors, including Metropolitan, at a competitive disadvantage in current and future attempts to procure contracts in the relevant market.

39. Absent Defendants' conspiracy and anticompetitive conduct, Metropolitan and other contractors would have been able to compete on the merits for and obtain contracts to perform services and provide products in the relevant market.

40. Defendants' anticompetitive conduct has directly and proximately caused Metropolitan to suffer injury to its business and property. Metropolitan's injuries are of the type the antitrust laws were designed to prevent, and those injuries flow directly from the aspect of Defendants' conduct that makes it unlawful.

41. More specifically, as a result of Defendants' anticompetitive conduct, Metropolitan has suffered damages, including:

a. The higher costs and lower efficiency resulting from the International Agreement's 50/50 Rule; and

b. The loss of potential contracts and profits due to higher costs and lower efficiency.

## COUNT II: CONSPIRACY TO MONOPOLIZE

42. Plaintiff incorporates Paragraphs 1-41 as set forth above herein by reference.

43. Through the International Agreement and the Market Recovery Program, the Defendants have engaged in a continuing combination and conspiracy to monopolize the relevant market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

44. In carrying out their conspiracy, Defendants have demonstrated and exercised market power in the relevant market with the specific intent to monopolize that Market.

45. The Defendants' conspiracy and anticompetitive acts in furtherance thereof had the effects they were intended to have, including among others:

a. Depriving purchasers in the relevant market of competition from non-local contractors for the installation of wood-based architectural products;

b. Depriving Metropolitan and other non-local contractors of the opportunity to compete on the merits for contracts in the relevant market;

c. Raising the costs to non-New York City-based rivals of competing in the relevant market by forcing non-local contractors to enter into a non-negotiable International Agreement that raises the costs of doing business in the relevant market only for non-local contractors; and

d. Decreasing output and artificially raising and maintaining the prices of installing wood-based architectural products in the relevant market.

46. The intended result of the Defendants' conspiracy has been and will be to place non-local competitors, including Metropolitan, at a competitive disadvantage in current and future attempts to procure contracts in the relevant market.

47. Absent Defendants' conspiracy and anticompetitive conduct, Metropolitan and other contractors would have been able to compete on the merits for and obtain contracts to perform services and provide products in the relevant market.

48. Defendants' anticompetitive conduct has directly and proximately caused Metropolitan to suffer injury to its business and property. Metropolitan's injuries are of the type the antitrust laws were designed to prevent, and those injuries flow directly from the aspect of Defendants' conduct that makes it unlawful.

49. More specifically, as a result of Defendants' anticompetitive conduct, Metropolitan has suffered damages, including:

   a. The higher costs and lower efficiency resulting from the International Agreement's 50/50 Rule; and

   b. The loss of potential contracts and profits due to higher costs and lower efficiency.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that:

a. This Court declare, adjudge, and decree that Defendants have committed the violations of federal law alleged herein;

b. This Court award Plaintiff full compensation for the damage it has sustained, from each Defendant, jointly and severally, on each of Plaintiff's Claims for Relief, in an

amount to be proved at trial, and to be trebled according to law, plus interest, attorneys' fees and costs of suit; and

c. This Court grant such further relief as may be just and proper, including injunctive relief to invalidate the International Agreement, to extend the Market Recovery Program to non-local contractors, and to prevent and restrain the Defendants from continuing their unlawful agreement, combination, or conspiracy.

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

Dated: July 31st, 2009

Paolo Morante, Esq.
Forrest W. Treat, Esq.
**DLA PIPER LLP (US)**
1251 Avenue of the Americas
27th Floor
New York, NY 10020-1104
(212) 335-4500
paolo.morante@dlapiper.com

By: _____
Anthony Colasanti
4 York Avenue
2nd Floor
West Caldwell, NJ 07006
(973) 228-8555
atc@atcolasantilegal.com